**Pedro SOSA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69454.**

Court of Criminal Appeals of Texas,
En Banc.

Feb. 15, 1989.

Rehearing Denied March 15, 1989.

Manuel P. Montez, San Antonio, for appellant.

Alger H. Kendall, Jr., Dist. Atty., Karnes City, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is an appeal from a conviction for capital murder. Punishment was assessed at death.

On November 4, 1983, appellant and his nephew, Leroy Sosa, traveled from San Antonio to LaVernia, Texas, in appellant's Thunderbird with the intention of robbing the LaVernia State Bank. Outside LaVernia, the duo passed a Wilson County deputy sheriff's car driven by the deceased, Deputy Sheriff Ollie Childress. Appellant decided they should use the deputy's car to rob the bank. Appellant and Leroy turned the Thunderbird around, caught up with the deceased and flagged him down. When the two cars had pulled to a stop, appellant, who was wearing a ski mask, got out of the Thunderbird, pulled out his gun and told the deceased they were going to use his car. Appellant disarmed the deceased, had him move over to the passenger's side of the patrol car and then got in behind the steering wheel.

Appellant and Leroy then drove both cars down an isolated dirt road. There they all got out of the vehicles and appellant told the deceased to take off the shirt of his uniform. The deceased did so and then was handcuffed with his hands behind his back. Appellant then put on the deputy's shirt and in the process, his ski mask was pulled up slightly so as to reveal the bottom part of his face. Appellant immediately pulled the ski mask down and then made the deceased climb into the trunk of the patrol car. Appellant and Leroy then drove both cars to the outskirts of LaVernia where they parked the Thunderbird.

After driving to the bank in the patrol car, the two went in the bank. Both appellant and Leroy were wearing masks throughout the robbery. In addition both men were armed and appellant was wearing the deceased's shirt and badge. While Leroy approached the tellers' windows and obtained the money, appellant herded all the people in the bank into a single office.

Witnesses testified that throughout the robbery, appellant appeared to be in charge. He continuously pointed to the badge and the shirt he was wearing and boasted that he had the deputy locked in the trunk of the car, that he was now the sheriff and if anybody tried anything he would kill the deputy.

In addition, at two separate times he pointed his cocked gun first at the head of the vice president of the bank and then at the head of the bank loan officer and threatened to blow their brains out if anything went wrong. After everyone was in the office and Leroy had gotten all the money, appellant attempted to take two women as hostages; however, one of the women became hysterical and the other woman refused to go. Finally appellant and Leroy left the bank, carrying approximately $51,000.

As they left the bank and drove back to the Thunderbird, they could hear the deceased in the trunk asking them to let him go. When they reached the Thunderbird, appellant told Leroy he was going to shoot the deceased because he had seen his face. Appellant then walked to the back of the patrol car, opened up the trunk and fired a shot at the deceased. The two men got into the Thunderbird and drove a short distance when appellant remarked that he had forgotten to wipe his fingerprints off of the trunk lid.

They drove back to the patrol car. Appellant got out of the Thunderbird, walked over to the patrol car, wiped off the trunk lid which had been left partially open, and then fired another shot into the deceased. After getting back in the Thunderbird, appellant told Leroy that he had to shoot the deceased again because he was still alive and moving. The two then returned to San Antonio. Appellant was arrested for the offense on February 4, 1984. Medical testimony established that the deceased died from two gunshot wounds in the neck.

■ In his first point of error, appellant argues that the evidence is insufficient to

support the jury's affirmative answer to the second special issue, the probability of future crimes of violence. Article 37.-071(b)(2), V.A.C.C.P. During the punishment phase of the trial, the State reintroduced the evidence offered at the guilt stage of the trial and then in addition offered evidence that in 1980, appellant had been convicted of Class A theft, placed on probation for one year and in 1981, after completion of the probation, the cause was dismissed. During cross-examination of the defense witnesses, the State also elicited the fact that appellant had been arrested in 1979 for unlawfully carrying a weapon. No other evidence was offered by the State.

In determining questions regarding sufficiency of the evidence, it is our duty to review the evidence in the light most favorable to the jury's findings. *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App.1986). Furthermore, it is often the case that the circumstances of the offense can alone sustain an affirmative answer to the second special issue. *Moreno v. State*, 721 S.W.2d 295 (Tex.Cr.App.1986); *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979). We agree with the State that this is such a case.

The evidence shows that appellant and Leroy had been considering committing a robbery for several weeks. In broad daylight after having armed themselves, the two set out to commit the robbery. After kidnapping the deceased at gunpoint, handcuffing him and stuffing him into the trunk of his car, they commandeered his car and drove to the bank. Witnesses in the bank at the time of the robbery described appellant as being in charge, acting as if he knew what he was doing and as if he had done it before, and acting in a very threatening manner. Indeed the record is clear

that during the robbery appellant threatened not only to kill the deceased, but also two bank employees. Finally, the record shows that appellant shot the deceased the first time in a totally cold and calculated manner. Then, not content with the violence he first wrought, he returned to the murder scene to complete his crime.

Appellant relies heavily on the recent case of *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr.App.1987).[1] Keeton is easily distinguishable from the instant case. In *Keeton*, although a horrendous crime was committed, there was only one instance of violence—one crime, if you will. In the instant case, on the other hand, a series of violent crimes was committed, escalating in the degree of violence until culminated by the most violent crime of all—the murder of the victim. We find appellant's conduct not only demonstrates a total disregard for the sanctity of human life but also demonstrates a tendency to resort to violence and threats of violence in order to accomplish his goals. After reading the record and viewing it in the light most favorable to the jury's verdict, we find the evidence sufficient to support their finding on the second special issue. *Moreno v. State*, supra; *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977). Appellant's first point of error is overruled.

■ Dr. Betty Lou Schroeder, a psychologist, testified at the hearing on appellant's competency to stand trial. It was established that Dr. Schroeder had prepared two reports regarding appellant. The first report dealt with sanity; the second dealt with competency. Dr. Schroeder testified that the two reports were identical through the first five pages, with only the sixth page which dealt with her conclusions being different. Dr. Schroeder testified that she mailed the two reports to the judge in

1. Our original opinion in *Keeton*, which found the evidence as to the second punishment issue insufficient and reformed the judgment to life was handed down on February 4, 1987. However, in an opinion delivered on April 15, 1987, on the Court's own motion for rehearing, the first opinion was withdrawn. In the opinion on rehearing, the Court again found the evidence as to the second punishment issue insufficient and reformed the judgment to life. However, the Court went on to abate the appeal for an evidentiary hearing in accordance with *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

the same envelope. On direct examination, Dr. Schroeder testified that in her opinion, appellant was competent to stand trial. During cross-examination, defense counsel handed his copy of Dr. Schroeder's report to her. At that time, it was discovered by defense counsel that although they had received Dr. Schroeder's report on sanity, they had never received a copy of the report on competency. Out of the presence of the jury, the judge surmised that when he received the reports, he thought they were identical and thus made only one copy and mailed it to defense counsel. Appellant moved for a mistrial on the basis that deprivation of the report infringed on his right of cross-examination. The court overruled the appellant's motion.

In his seventh point of error, appellant argues that the trial court erred in refusing to grant the mistrial. We disagree. As noted above, the reports were identical with the exception of the last page of each. The sixth page of the report on sanity which was provided to defense counsel prior to the hearing reads as follows:

*"CONCLUSIONS:* In response to the questions issued in the order provided by J. Taylor Brite, District Judge Providing (sic), Atascosa County, Texas, the following is provided:

"1. In my opinion, this defendant (sic) is not mentally ill but rather has a personality disorder which is simply a maladaptive pattern of behavior which is learned and reinforced from the environment and is qualitatively different from a thought disorder or a type of mental disorder. He does not require observation, treatment, or hospitalization in a mental hospital for his own welfare and for protection of others.

"2. In my opinion, the defendent (sic) is not mentally retarded and does not require commitment to a mental retardation facility. His level of mental ability is seen within the dull normal to borderline range; and is probably a variable of psycho-social deprivation and/or little interest in academic pursuit.

"3. In my opinion, this defendent (sic) was well aware that his conduct was wrong at the time of the offense; *he is therefore considered not only sane at the present time but sane at the time of the commission of the offense and competent to come to trial."*

The sixth page of the report on competency, which was not given to defense counsel prior to trial, but which was furnished to counsel during examination of the doctor, reads as follows:

*"CONCLUSIONS:* In response to the questions issued in the order provided by J. Taylor Brite, District Judge Presiding, Atascosa County, Texas, the following is provided:

"1. In my opinion, the defendent (sic) is competent to come to trial and has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding.

"2. The defendent (sic), in my opinion, has a rational as well as factual understanding of the proceedings against him.

"3. In my opinion, the defendent (sic) is well able to adhere his conduct to societal expectations should he desire to do so."

We find it hard to imagine how appellant's attorney could be surprised by the conclusions given on page six of the competency report when the sixth page of the sanity report also contained a finding that appellant was competent to stand trial. Furthermore, we note that appellant did not request a continuance of the competency hearing so as to further prepare himself for cross-examination. Rather after the denial of his motion for mistrial, the jury was called back into the courtroom and appellant renewed his cross-examination of Dr. Schroeder. We agree with the State that appellant was not harmed nor in any manner prejudiced by the receipt of the sixth page of the report on competency on the day of the hearing. *Parker v. State,* 594 S.W.2d 419 (Tex.Cr.App.1980). Appellant's seventh point of error is overruled.

In a multifarious point of error, appellant argues that the trial court erred in overrul-

ing his motion to suppress the oral statement he made at the time of his arrest and the written confession he later gave. He argues that the failure to administer adequately the *Miranda* warnings and to ascertain whether he clearly understood the proceedings and ramifications of his statements and waiver rendered his statements inadmissible.

■ At the hearing on the motion to suppress, evidence showed that authorities obtained a federal arrest warrant for appellant on December 18, 1983. On February 4, 1984, members of the FBI and other law enforcement agencies were conducting a surveillance operation in hopes of spotting appellant. Around 9:00 p.m. that evening, a vehicle was observed leaving the area under surveillance at a high rate of speed. Two FBI agents, Ronald Clendening and Paul Hasselbach, followed the vehicle for a short distance and then pulled it over. Clendening testified that when the cars stopped, appellant exited from the driver's side of the car and began walking towards the rear of the car. Clendening yelled to appellant to stop and raise his hands. When appellant continued walking, Clendening yelled, "FBI, we have a warrant for your arrest." Clendening then told appellant to lean over the car and place his hands on the lid of the trunk. Appellant then said, "You have the right one, I am Pete."

Appellant initially contends that this statement should not have been admitted into evidence at trial. We disagree. We find that appellant's statement was res gestae of the arrest and was not a result of custodial interrogation. As such it was clearly admissible under Article 38.22, Section 5, V.A.C.C.P., which provides in pertinent part:

"Sec. 5. Nothing in this article precludes the admission of a statement ... that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation...."

We find no error in the admission of this statement. *McKay v. State*, 707 S.W.2d 23 (Tex.Cr.App.1985); *East v. State*, 702 S.W. 2d 606 (Tex.Cr.App.1985).

After appellant was arrested, handcuffed, and searched, Special Agent Clendening read him his warnings, after which he asked appellant if he had any questions. Appellant replied in the negative and said he understood what Clendening had read to him. Appellant was put in the back seat of the FBI agents' car and transported to the San Antonio FBI office. On the way to the FBI office, Clendening asked appellant if he had been involved in the LaVernia bank robbery and appellant replied in the affirmative. When they reached the FBI office, appellant was taken into an interview room where his handcuffs were removed. There Special Agent Moses Alaniz obtained a form entitled "Interrogation; Advice of Rights". At 9:42 p.m., Alaniz read the warnings off of the form to appellant. The pertinent part of the form reads as follows:

"Before we ask you any questions, you must understand your rights.

"You have the right to remain silent.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

Beneath this part of the form was a portion entitled "Waiver of Rights:"

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no

pressure or coercion of any kind has been used against me."

Immediately below this text was a signature line which appellant signed at 9:44 p.m. One change was made in the above text with the result that the first line reads: "I have *been* read this statement of my rights and I understand what my rights are." Thereafter appellant was interviewed by Special Agent Alaniz and Special Agent Clendening. Also present during portions of the interview were Texas Ranger Al Cuellar, Wilson County Sheriff Pete Baumann, and District Attorney investigator Kenneth Denn. During the first one and a half hours, appellant gave an oral statement. Thereafter an FBI stenographer was called in. Appellant was taken to the steno room and seated at a desk beside the stenographer. Then, as appellant dictated, his statement was recorded by the stenographer. The recording of appellant's written statement began at 11:30 p.m. After the statement had been typed on a preprinted form, the entire statement including the preprinted warnings were read to appellant. The preprinted portion of the form is set out below:

I, Pedro Solis Sosa, before being interviewed, interrogated or questioned by SA Moses P. Alaniz, FBI on February 4, 1984 at 9:42 P.M., at FBI, San Antonio and before making this statement was warned by SA Alaniz, the person to whom this statement is given, that (1) I had and have the right to remain silent and not make any statement at all and that any statement I make may be used in evidence against me at my trial; (2) I had and have the right to an attorney, and that if I am unable to employ an attorney one will be provided for me; (3) I had and have the right to have an attorney or lawyer present to advise me prior to and during any questioning or interrogation by peace officers or attorneys for the State; and (4) I had and have a right to terminate the questioning, interview or interrogation at any time. "I understand my rights as set out in this warning and knowing what they are I freely and voluntarily, without being forced or compelled by promises, threats or persuasion, waive these rights and make the following statement in writing:"

After the statement had been read to appellant and he had made several corrections, appellant signed the statement. Every law enforcement officer present during the taking of appellant's statement testified at the motion to suppress that no promises, coercion, or any type of force or threats were used to induce appellant to confess. Appellant did not testify at the hearing on the motion to suppress.

■ The trial judge is the trier of fact at a hearing on the voluntariness of a confession. He is the exclusive judge of the credibility of the witnesses as well as the weight to be afforded their testimony. Our review of the trial court's determination is limited to whether an abuse of discretion occurred. *McCoy v. State*, 713 S.W.2d 940 (Tex.Cr.App.1986); *Bonham v. State*, 680 S.W.2d 815 (Tex.Cr.App.1984). After the hearing on appellant's motion to suppress, the trial court concluded that appellant's written statement was voluntarily made. We have read the record and find that it supports the trial court's conclusions. Appellant was warned of his rights three times during the course of the evening in accordance with *Miranda* and Article 38.22, V.A.C.C.P. On each occasion, he acknowledged that he understood his rights, that he wished to waive them and that he wished to talk with the FBI agents. We find nothing in the record to support appellant's claim that his confession was involuntary.

■ Appellant's brief seems to make a general attack on the voluntariness of the confession. Although we do not read it as specifically arguing that the warnings given to appellant did not comply with the warnings set out in Article 38.22, supra, we note that he did make this argument at the hearing on the motion to suppress and the prosecution specifically addressed this argument before this Court. We have previ-

ously held in several cases that a warning which is only slightly different from the language of the statute but which conveys the exact meaning of the statute is sufficient to comply with the statute. *Penry v. State*, 691 S.W.2d 636 (Tex.Cr.App.1985); *Hardesty v. State*, 667 S.W.2d 130 (Tex.Cr. App.1984); *Eddlemon v. State*, 591 S.W.2d 847 (Tex.Cr.App.1980). We have reviewed the warnings given to appellant in the instant case and find them sufficiently similar to comply with the warnings set out in Article 38.22, supra. Appellant's fourth point of error is overruled.

■ Next, appellant argues that fundamental error occurred when the trial court failed to instruct the jury during the punishment phase of the trial that they could consider mitigating circumstances in their deliberations on the special issues. Appellant did not request such an instruction at trial.

In *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980), another capital murder case, this Court held that no jury charge regarding evidence of any mitigating circumstances was necessary since the questions prescribed under Article 37.071, supra, clearly allow the jury to grasp the logical relevance of mitigating evidence. This holding has been endorsed and followed in *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.1984), *Penry v. State*, 691 S.W.2d 636 (Tex.Cr.App.1985), *Anderson v. State*, 701 S.W.2d 868 (Tex.Cr.App.1985) and *Fierro v. State*, 706 S.W.2d 310 (Tex. Cr.App.1986). Furthermore, a review of the charge given to the jury during the punishment phase of the instant case shows that they were instructed to consider *all* of the evidence before them. Included in the instructions to the jury was the following language:

"You are further instructed that in determining each of these Special Issues you may take into consideration all of the evidence submitted to you in the full trial of the case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to Special Issues hereby submitted to you."

We find no error. This point of error is overruled.

■ In his fifth point of error, appellant argues that Article 37.071(b)(2) V.A.C.C.P., is unconstitutional in that it diminishes the burden of proof required under the Fifth and Fourteenth Amendments to the United States Constitution, Article 1, Sections 10 and 19 of the Texas Constitution and even Article 37.071(c). Specifically he maintains that since the jury is required to find only a *probability* that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, the standard of proof is significantly less stringent than proof beyond a reasonable doubt. Although appellant's argument is quite novel, we find it to be without merit.

Article 37.071, supra, governs the procedure to be followed during the punishment phase of a capital murder trial. Paragraph (a) sets out the general procedure to be used. Paragraph (b) sets out the special issues which are to be submitted to the jury. Paragraph (c) then contains the following:

"(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted."

To single out the word "probability" from the language of the second special issue and infer a lessening of the State's burden of proof is to take the word totally out of context. Such an interpretation of the statute violates the spirit of the Code Construction Act, which specifically provides in Section 311.011(a), Government Code, that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." The Act also provides in Section 311.021, Government Code, that "In enacting a statute, it is presumed that: ... (2) the entire

statute is intended to be effective; ..." To construe the second special issue as argued by appellant would be to nullify paragraph (c) of Article 37.071, supra. Thus we find that the use of the word "probability" does not in any way reduce the burden of proving the special issues to anything less than beyond a reasonable doubt.

█ Furthermore, we find that as applied to appellant in the instant case, the jury was clearly and explicitly instructed that each special issue had to be proved beyond a reasonable doubt before an affirmative answer to the special issue would be justified. The charge on punishment contained the following language:

"The burden of proof in this phase of the trial still rests upon the State and never shifts to the defendant. *Each Special Issue submitted must be proved by the State beyond a reasonable doubt; therefore, before any issue may be answered 'Yes,' all jurors must be convinced by the evidence beyond a reasonable doubt that the answer to such issue should be 'Yes.'* If the jury unanimously determines (and only if such determination is unanimous) that the State has proved an issue *beyond a reasonable doubt,* then the Foreman will so record the Jury's answer to such issue by signing his name to the finding reflecting such answer on the form provided for that purpose.

"You are further instructed that if any juror, after considering the evidence and these instructions, has *a reasonable doubt* as to whether the answer to a Special Issue should be answered 'Yes,' then such juror should vote 'No' to that Special Issue in the jury's deliberations." (emphasis added)

Thereafter the special issues were set out with the verdict forms immediately underneath each special issue. The portion of the charge relating to the second special issue reads as follows:

## "SPECIAL ISSUE NO. 2

"Is there a probability that the defendant, Pedro S. Sosa, would commit criminal acts of violence that would constitute a continuing threat to society?

### "Answer

"We, the Jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is 'Yes'.

_____

Foreman

### "OR

"We, the Jury, because at least ten (10) jurors have a reasonable doubt as to the matter inquired about in this Special Issue, find and determine that the answer to this Special Issue is 'No.'

_____

Foreman"

The jury foreman signed the first verdict form, signifying an affirmative answer to the second special issue.

We have found nothing in the record and appellant has not pointed out anything in the record which indicates that the jury was confused or misled as to the burden of proof. Consequently, we find that the language of Article 37.071(b)(2) is constitutional both in general and in its specific application to appellant.

█ Finally in two points of error, appellant complains of error in the voir dire of the jury. Prospective juror Profira Cordova was excused upon a challenge for cause by the State. Appellant now maintains that she was erroneously excused before any inquiry could be made as to her views on capital punishment. He argues that her excusal violates the holding in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The State correctly counters that in a capital murder case a prospective juror's views on the death penalty are not the only basis for a challenge for cause. The State further asserts that Cordova was properly excused under Article 38.16 V.A.C.C.P., when her testimony showed that she could not be a fair and impartial juror. We agree.

Prior to the voir dire examination, Cordova had told the judge that because of family problems, she could not serve on the jury. When questioned about this by the prosecutor, Cordova related that her father was in a rest home and near death, and in addition her disabled brother and ailing mother lived with her and she was entrusted with their care. Cordova testified that due to her family situation, she felt that her mind would be so preoccupied that she would not be able to reach a decision in the case and thus could not be a fair and impartial juror. The State then made a challenge for cause and the trial court granted the challenge over appellant's objection.

This Court approved a similar challenge for cause in *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976), where the trial court granted a challenge for cause to a juror who stated that she could not be fair and impartial because she was a single mother of two children, she was not paid when she was not working, and she would not be able to keep her mind on the case because she would be worrying how to pay her bills. See also *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978) (overruled on other grounds) (where the granting of a State's challenge for cause was approved after the prospective juror testified that he was preoccupied by personal and business problems that would interfere with his ability to serve on the jury).

■ Based on the above, we find that the juror was properly excused under Article 35.16(a)(9), supra, which provides that a juror may be challenged for cause if "he has a bias or prejudice in favor of or against the defendant." As we stated in *Smith v. State*, 641 S.W.2d 248 (Tex.Cr. App.1982) (Opinion on Rehearing), under this provision it is not necessary to show a particular bias or particular prejudice in favor of or against the defendant. It is sufficient that the juror stated she could not be a fair and impartial juror. This point of error is overruled.

■ Finally, appellant argues that the trial court erred in excusing prospective juror Imogene Goodwin because although she repeatedly testified that she was against the death penalty and wanted no part of it, she at one point testified that she would take the oath to base her verdict upon the evidence and the law. Appellant argues that this statement rehabilitated Goodwin and she should not have been excused.

Our reading of the voir dire examination indicates that appellant is misreading the record. Upon initial examination by the State, Goodwin voiced her opposition to the death penalty. Thereafter the following excerpt occurred. This excerpt is the crux of the voir dire examination of Goodwin and includes the portion which appellant maintains rehabilitated Goodwin as a juror. We have underlined that portion:

"Q. Now it could be a situation where the State proves in a capital murder case the answer should be 'yes', but, on the other hand, you believed, 'Well, yes, the State has met their proof, the State has done what the law says they're supposed to do, but I don't believe in a capital murder case, the punishment, I don't believe in the death penalty, and so I am going to vote "no", if that is the way I feel,' then I would not be a fair and impartial juror. Is that the way you feel?

"A. That is the way I feel.

"Q. And you would vote 'no', regardless of what evidence is presented?

"THE COURT: Mrs. Goodwin, let me explain this, now—

"THE JUROR: I don't think I should be put on a jury where I have to make that decision, I mean that is my opinion.

"THE COURT: You would start out by taking an oath, they're just asking you how you feel. Don't be upset about it, and there're not any right or wrong answers—

"THE JUROR: Yes, well—

"THE COURT: But you will take an oath that you will base your verdict upon the evidence and the law.

"THE JUROR: Yes.

"THE COURT: Not the way you feel necessarily about an issue, you see, because that would be—let's just lay it on the line, it would be unfair to one side or the other in the trial of this type of case if you feel that way, and there is not anything wrong with it, one way or the other, and that is the reason they're asking you from both sides, or will ask you from both sides, but you start out by taking an oath that you will base your verdict, whether it be on the guilt or innocence, or the punishment, you understand? ... Okay, now, gentlemen, let me just ask you, Mrs. Goodwin, like I say, don't feel bad one way or the other, let's just turn the situation around. If a juror felt that, you know, before they start, that a person should, in this type of case that is on trial, based on the way they feel, are to receive the death penalty, or are to receive a life sentence, either way, you understand—

"THE JUROR: Yes, sir.

"THE COURT: You could not base it completely on the evidence and the law, either way, you understand?

"THE JUROR: Yes.

"THE COURT: Because of the death penalty in certain cases is allowed by law, you understand?

"THE JUROR: Yes, sir.

"THE COURT: Some people just have a hang-up about it, and that is all the attorney is asking. If you feel like that, let's put it this way, if you feel like the fact that the death penalty is involved, that, in and of itself, would affect your answer, you know, to some questions—

"THE JUROR: Yes.

"THE COURT: Just tell them honestly, or if it would not?

"THE JUROR: I think it would."

Thereupon the prosecutor resumed his questioning:

"Q. ... if I understand what you're saying, that you do not believe in the death penalty, you do not—

"A. No, sir.

"Q. And if I also understand what you're telling me is that if the State proves that the answer to these questions should be 'yes', and the result, knowing the result would be the death penalty, that you would vote 'no', just so that the person would not get the death penalty, is that what you're saying?

"A. I supposed that is the way to put it. I don't think that I should be put in that position, though.

.   .   .   .   .

"Q. ... if you are selected on the jury, you would be put in that position, and if you feel so strongly against the death penalty that, you know, you're going to vote, answer one of those questions 'no', just to be sure that a person does not get the death penalty, then I need to know that because if that is the way you feel.

"A. Yes, I do."

The State then moved that Goodwin be challenged for cause. Before granting the challenge, the court asked the prospective juror one more time if her feelings about the death penalty would affect her answers to the special issues. When Goodwin replied in the affirmative, the Court excused her from service.

Although the questions posed to Goodwin are not the most articulately phrased which we have reviewed, it is apparent from our reading of the record that Goodwin was clearly excludable under the test enunciated in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The record makes clear that Goodwin's views would impair the performance of her duties as a juror in accordance with her instructions and her oath. *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App.1985). This point of error is overruled.

Having found no reversible error, we affirm the judgment of the trial court.

WHITE, J., concurs in the result.

TEAGUE, J., dissents.

CLINTON, Judge, concurring.

In its treatment of appellant's last point of error the majority concludes "that Goodwin was clearly excludable under the test enunciated in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)." Slip op. at 919. This Court's proper appellate function does not include *de novo* determinations of "substantial impairment," *vel non.* Rather, this Court should examine the record to ascertain whether there is a reasonable basis in the responses of the venireman to support the trial court's implied finding of substantial impairment.

In the past, and especially since the decision of the Supreme Court in *Wainwright v. Witt,* supra, this Court has paid lip service to the trial court's discretion in ruling upon State's challenges for cause. A typical statement appears in *Ex parte Russell,* 720 S.W.2d 477, at 485 (Tex.Cr.App.1986):

> "In making the determination of the qualification of a juror, great deference is to be given to the decision of the trial judge, who has broad discretion in his rulings in challenges, who was present, heard the tenor of the voice of the prospective juror, his demeanor, etc."

See also, e.g., *Smith v. State,* 676 S.W.2d 379, at 387 (Tex.Cr.App.1984); *Smith v. State,* 683 S.W.2d 393, at 401, n. 5 (Tex.Cr.App.1984); *Vanderbilt v. State,* 629 S.W.2d 709 (Tex.Cr.App.1981). Having granted this discretion to trial courts, however, it seems to me we turn around and effectively revoke it when we continually conclude our discussions on these points of error with holdings that "we find" the venireman to have been substantially impaired, or that "clearly" he was so. At least in the context of what has been termed "equivocating" or "vacillating" veniremen, see *Williams v. State,* 622 S.W.2d 116, 121 (Tex.Cr.App.1981) (Teague, J., dissenting), it seems to me that due deference to the trial court means that he has discretion to find such a venireman is *not* in fact impaired, in spite of some obvious difficulty he may have. Categorically to hold, or at least to imply as our holdings do, that such

a venireman is in every case substantially impaired sends a message to trial courts that in fact they do *not* have the discretion to overrule State's challenges for cause in the premises. Rather, as a matter of appellate review, this Court should simply hold there is a reasonable basis in the record to support a finding by the trial court that the venireman will be impaired in his ability to abide by his oath as a juror. *Hernandez v. State,* 757 S.W.2d 744 (Tex. Cr.App.1988) (Plurality Opinion). Such a standard of appellate review does not preclude the trial court from exercising its discretion to find that a venireperson, who may appear in a cold appellate record to be truly equivocating or vacillating, actually proved, by demeanor, tone or howsoever, able in fact to follow the law. See *Perillo v. State,* 758 S.W.2d 567, at 577 (Tex.Cr. App.1988). The voir dire examination set out in the majority opinion is sufficient to support the *trial court's* conclusion that venireman Goodwin was substantially impaired.

Because in that and in other respects I am unable to agree with particulars of its treatment of some points of error, I concur only in the result reached by the majority.

With those reservations, I join the judgment of the Court.