

NUMBER 13-09-00267-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI    -    EDINBURG

BRUCE HUGHES,                                                                          Appellant,

v.

THE STATE OF TEXAS,                                                                    Appellee.

### On appeal from the 24th District Court
### of Victoria County, Texas.

## MEMORANDUM OPINION

### Before Justices Yañez, Rodriguez, and Garza
### Memorandum Opinion by Justice Garza

Appellant, Bruce Hughes, was convicted of capital murder and sentenced to life imprisonment. *See* TEX. PENAL CODE ANN. § 19.03 (Vernon Supp. 2009). By four issues, Hughes argues on appeal that: (1) he was administered insufficient warnings prior to making a custodial statement to police, *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3 (Vernon 2005); (2) because of the insufficient warnings, the trial court erred in admitting the statement into evidence; (3) without the statement, the testimony of an accomplice witness was insufficient to support the judgment; and (4) the evidence as to the victim's cause of death was factually insufficient to support the judgment. We affirm.

## I. BACKGROUND

On March 27, 2008, Hughes was indicted by a Victoria County grand jury on one count of capital murder and one count of murder. *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003), § 19.03.[1] Hughes pleaded not guilty to each count.

At trial, housekeepers Sarah Jeanis and Mary Alice Cano testified that, on March 8, 2006, they were asked to clean out apartment A2 of the Crossroads Apartments housing complex in Victoria, Texas. Jeanis and Cano were told that the apartment was vacant; however, when they opened the front door, they discovered the apartment was occupied. Jeanis called the apartment complex's office for assistance. Nellie Perez, an assistant manager, then arrived and discovered the dead body of Melba Eileen Lott inside the apartment. Officer Shane Wallace of the Victoria Police Department overheard the police radio dispatch reporting the incident and went to the scene. When he entered the apartment, Officer Wallace "immediately detected a strong odor. This odor is similar to a decaying human body—[t]here's nothing similar to it. I've never smelled anything, while working or my life experiences, that is anything in comparison to it." Officer Wallace also stated that he "noticed some small spots of blood on the kitchen floor" where the body was situated as well as in the hallway and bathroom of the apartment. According to Officer Wallace, "[t]here was so much blood spatter [in the apartment] that it resembled a Hollywood movie."

Dozens of photographs taken by police investigators were presented to the jury. Several photographs depicted extensive blood spatter in the kitchen, hallway, bedroom and bathroom of the apartment. Other photographs depicted empty beer cans and liquor

---

[1] The first count alleged that Hughes intentionally caused the death of Melba Eileen Lott while in the course of committing or attempting to commit the offense of robbery. *See* TEX. PENAL CODE ANN. § 19.03 (Vernon Supp. 2009). The first two paragraphs of the second count alleged that Hughes intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Lott's death. *See id.* § 19.02(b)(2) (Vernon 2003). The second two paragraphs of the second count alleged that Hughes intentionally, knowingly, or recklessly committed or attempted to commit aggravated assault, and in the course of and in furtherance of that commission or attempt, committed an act clearly dangerous to human life that caused Lott's death. *See id.* § 19.02(b)(3).

2

bottles scattered around the apartment. Another photograph, introduced as the State's exhibit 64, depicted what appeared to be a steak knife found in the bedroom. The knife had a long, thin blade which had been bent at approximately a right angle.

Bryan Strong, a forensic scientist and certified fingerprint examiner for the Texas Department of Public Safety, testified that he performed an analysis of fingerprints on two beer cans found at the crime scene. Strong concluded that the prints matched the left thumbprint of Hughes and the right index fingerprint of Stanford Harvey, Lott's upstairs neighbor.[2] Strong also analyzed bloody fingerprints on a white paper instruction manual recovered from Lott's apartment; those prints also matched Hughes's left thumbprint. Finally, Strong testified that he examined bloody fingerprints located on the handle of the steak knife found in Lott's bedroom. The fingerprints on the knife matched Hughes's left middle fingerprint; no other prints were found on the knife.

Another Texas Department of Public Safety forensic scientist, Robin Olson Castro, testified that she performed DNA analyses of blood samples taken from Lott's apartment. Castro found the DNA profile of a stain on a jacket found in Lott's bedroom to be "consistent with the DNA profile of Bruce Hughes." When asked by the prosecutor whether "a probability analysis" had been conducted, Castro replied in the affirmative and noted that "[t]he probability of selecting an unrelated person at random who could be a source of this DNA is approximately one in 515.5 quintillion for Caucasians, one in 101.6 quintillion for Blacks, and one in 8.299 sextillion for Hispanics." According to Castro, DNA analysis of other blood stains located in Lott's apartment—including stains from the hallway, kitchen floor, and inside the pocket of a pair of pants found at the scene—produced the same results, conclusively identifying the blood as Hughes's. Other blood samples taken from Lott's apartment, including a sample taken from the blade of the steak knife recovered from her bedroom, were consistent with the DNA profiles of both Lott and Hughes.

---

[2] Harvey was also charged with Lott's murder and was tried separately.

3

Detective Jason Turner of the Victoria Police Department testified that he is trained in blood spatter analysis and that he examined the various photographs of blood spatter in Lott's apartment. After reviewing the photographs, Detective Turner stated that, in his opinion, "the victim was, at one point, almost in a seated position, up against the wall, before she slid, possibly, succumbing to a beating or injury." In one photograph, the blood spatter appeared to form a "V" pattern; Detective Turner noted that this is a "telltale sign" of "impact spatter" and agreed with the conclusion that this had been caused by "something . . . striking the victim's head and face while the victim's head and face rested" below where the spatter was located. The pattern was, according to Detective Turner, "consistent with a beating while [the victim] is down on the ground."

Amanda Jo Walters, an inmate in the Victoria County Jail who was also charged with Lott's murder, testified on behalf of the State after being granted testimonial immunity by the trial court. Walters testified that she had sold drugs to Harvey in the past and that she had seen Hughes use cocaine on three previous occasions. On the last occasion, she had used crack cocaine with Harvey and Hughes at Harvey's apartment. At one point during that evening, according to Walters, Harvey stated "there was some money downstairs and he wanted me to give him some coke, to take it down there." When asked to clarify, Walters confirmed that Harvey had asked her to give him some crack cocaine so that he could sell it to Lott, who lived downstairs from him. According to Walters, Harvey also discussed robbing Lott or selling her the drugs and then stealing them back.

Walters testified that she, Harvey, and Hughes proceeded downstairs to Lott's apartment. At that point, Walters gave a small amount of crack cocaine to Harvey and then went to Lott's bathroom where she consumed the remaining crack cocaine that she had on her person. When she emerged from the bathroom, Walters observed Hughes "grab" Lott as Lott was attempting to leave the apartment. Walters heard Harvey say that "[i]f she [Lott] didn't give him the money, he'd kill her." Walters then exited the apartment and went out to the parking lot of the apartment complex. In the parking lot, Walters could

4

hear "a sound, like fighting and stuff"; she also heard Lott saying "[h]elp" and "[p]lease stop" a total of four times. She then observed Harvey and Hughes return to Harvey's apartment, at which point, according to Walters, Hughes went to the kitchen to wash blood off his hands. Walters also testified that Hughes had changed his pants while he was in Lott's apartment.[3]

David Dolinak, M.D., a forensic pathologist and chief medical examiner with the Travis County Medical Examiner's Department, testified that two autopsies had been carried out on Lott's body. The first autopsy, conducted by Elizabeth Peacock, M.D., was performed prior to burial. The body was later exhumed and Dr. Dolinak performed a second autopsy. Dr. Dolinak testified that he reviewed Dr. Peacock's report from the first autopsy, and he summarized her conclusions as follows:

> Dr. Peacock concluded that Melba Lott had died as a result of cocaine toxicity, or a type of drug death.
>
> She, also, noted that there were blunt force injuries of the face that may have been inflicted by another person or as a result of an accident or fall.
>
> So, when she listed cause of death, she concluded that Melba Lott had died of cocaine toxicity, but another significant factor in her report was blunt force injuries of the face.

Dr. Dolinak also testified that a toxicology report, which was ordered by Dr. Peacock, showed that Lott had cocaine, alcohol, and cocaethylene[4] present in her muscle tissue. According to Dr. Dolinak, although cocaine toxicity was listed as the cause of death in Dr. Peacock's autopsy report, "[t]here's, really, no way for us to know for sure that cocaine is what killed a person, if [the death is] not witnessed."

Following his autopsy of Lott's body, Dr. Dolinak also prepared a report. Unlike Dr. Peacock, however, Dr. Dolinak concluded that the cause of Lott's death was "homicidal

---

[3] When asked how she knew that Hughes had changed his pants, Walters stated: "Because the ones he had on were like—[k]ind of lighter than the pants that he had when he went in there, where—unless I was just high, it looked like he had changed pants."

[4] Dr. Dolinek testified that cocaethylene is a compound that is part alcohol and part cocaine, and is formed in the body after a person consumes both substances.

violence," with blood loss, ingestion of blood, and inhalation of blood all potentially contributing to the death. Dr. Dolinak explained precisely why his conclusion differed from that of Dr. Peacock:

> In the ensuing time [following Dr. Peacock's autopsy], more investigation had been done on the case, and I did an autopsy of Melba Lott. And what I had found was—I had removed flesh from her face, the decomposed tissues, and I saw some fractures—small fractures, around her nose and the bottom parts of both eyes. I did a review of the original photographs from the first autopsy and I was able to appreciate, even though the tissues were decomposed, what looked like cuts around her . . . forehead, nose, and around her eyes. They may have been cuts or they may have been tears in the tissues. It was hard to say for sure, just because the tissues were decomposed, but she definitely had injuries about her face.
>
> . . . .
>
> I had, also, reviewed photographs from the scene, from where Melba Lott had been found dead, and had seen on those pictures quite a bit of blood about the body. The blood was spattered—spattered on the walls and blood was in a lot of different areas at the residence. It was a very bloody scene.
>
> With that information, I, also, had additional police investigative information, witness statements, that I had gone through, describing what appeared to be a violent altercation before her death. And knowing that, through the investigation, a bloody, bent knife had been found in her residence, with a fingerprint on it that was not hers, I take all of that information together and it's clear to me that she didn't just die of a cocaine overdose. She died a violent death.

Dr. Dolinak further testified that the knife depicted in State's exhibit 64 would be capable of making the "penetrating" and "sharp force" injuries that he had observed in his autopsy, and that the amount of blood spatter visible in the apartment indicated that what had occurred there was "a lot more than" just an accidental fall. He also stated that he observed dark tissue, indicative of prior bruising, on Lott's left wrist, forearm, and shoulder, which were consistent with defensive wounds.

On cross-examination, Dr. Dolinak acknowledged that Dr. Peacock had previously worked at the Travis County Medical Examiner's Office, and that he had never personally witnessed the crime scene or personally handled the evidence upon which he based his conclusion as to Lott's cause of death. Dr. Dolinak also agreed that people who use cocaine can experience paranoid psychosis, auditory hallucinations, and a disassociation

6

with reality.

Dr. Peacock testified that she has no "particular recollection" of her autopsy of Lott, but she stated that she did not, as part of the autopsy, remove the skin and tissue from the face. She said that she has "a vague memory" of having reviewed photographs from the scene of Lott's death, but she could not recall whether she viewed the photographs before or after the autopsy. Dr. Peacock also stated that she was not "made aware of any statements made by people purported to be eyewitnesses" to Lott's death. She acknowledged that, if she had been able to remove all the flesh from the body and examine the extent of the injuries to Lott's facial bones, she "might very well have" reached the same conclusion as Dr. Dolinak as to Lott's cause of death. However, she stated that "I still don't believe that the fractures described [in Dr. Dolinak's report] are sufficient to cause death."

On March 17, 2008, Hughes was arrested and transported to the Victoria County Jail, where he was interviewed by Victoria Police Department detectives Turner and Amanda Clemons.[5] A video and audio recording of the interview was played to the jury and a transcript of the interview with certain material redacted was entered into evidence.[6] The interview transcript reveals that, prior to questioning Hughes, Detective Clemons administered the following warnings to him:

> You have the right to remain silent. Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions and have him during here—during—here during any questioning. If you cannot afford a lawyer, one will be appointed to you before any questioning.
>
> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time. You also have the

---

[5] At the time of the investigation, Detective Clemons was known as Amanda Moeller, and the latter name is used exclusively by Hughes in his appellate brief.

[6] Prior to trial, defense counsel filed a motion to suppress Hughes's custodial statement. After a hearing, the trial court denied the motion. At trial, the statement was admitted into evidence over the objection of defense counsel.

right to stop answering questions at any time should you decide to talk to a lawyer.

When Detective Clemons asked Hughes whether he understood those rights, Hughes responded, "Yes, ma'am, uh-huh."

Hughes stated in the interview that he and Lott were lovers and had used drugs for two continuous days starting on or about Valentine's Day of 2006; that the two later got into a physical altercation; that he struck Lott with his fists "maybe about 30 times"; that Lott attempted to come after him with a knife; that he "grabbed the knife" and cut his finger; that Lott threw a heater at him; that he left the apartment with Lott lying on the floor of her bedroom; and that he changed his clothes before he left the apartment because he had blood on his clothes. Hughes denied that Walters or Harvey were with him that night. The interview continued:

| Q. [Detective Turner] | [I]n hindsight, Bruce, looking back, are you—are you sorry for what you did? |
|---|---|
| A. [Hughes] | Man, I'm sorry every day, man. |
| Q. | I mean, is it safe to assume, just by what you're telling me, is it safe to assume that [Lott] died from wounds that she sustained from you? Did she die from you beating her up so bad? |
| A. | Pretty much. |
| Q. | Did you mean—did you mean to kill her? |
| A. | No, sir. . . . We had a fight. She fought me harder than any man ever fought me. |

The jury found Hughes guilty of capital murder, and, because the State did not seek the death penalty, Hughes was automatically sentenced to imprisonment for life without parole. *See id.* § 12.31(a) (Vernon Supp. 2009). This appeal followed.[7]

_____

[7] The State has not filed a brief to assist us in the resolution of this matter.

## II. Discussion

### A. Sufficiency of Warnings

By his first and second issues, Hughes argues that the warnings administered by Detective Clemons prior to his custodial interview were insufficient under article 38.22 of the Texas Code of Criminal Procedure, and that the trial court therefore erred in denying his motion to suppress and admitting his ensuing statement. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3.

#### 1. Standard of Review

Generally, we review a trial court's admission of evidence for an abuse of discretion. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). We afford almost total deference to a trial court's determination of historical facts, especially when those findings are based on an evaluation of credibility and demeanor. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *State v. Oliver*, 29 S.W.3d 190, 191 (Tex. App.–San Antonio 2000, pet. ref'd). Similarly, we afford great deference to the trial court's rulings on application of law to fact questions when resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *See Guzman*, 955 S.W.2d at 89. However, we review de novo mixed questions of law and fact not falling within this category. *See id.* Here, the facts surrounding Hughes's statement are not in dispute; the only matter at issue is whether Detective Clemons's warnings satisfied article 38.22. Because this is a pure question of law, we will review the trial court's ruling de novo. *See Guzman*, 955 S.W.2d at 89; *Yarborough v. State*, 178 S.W.3d 895, 901 (Tex. App.–Texarkana 2005, pet. ref'd); *Oliver*, 29 S.W.3d at 191.

#### 2. Applicable Law

Article 38.22, section 3 of the code of criminal procedure provides that an oral custodial statement is inadmissible as evidence unless, among other things, the accused is warned prior to the statement as provided in section 2 of that article and knowingly, intelligently, and voluntarily waives the rights set out in the warning. TEX. CODE CRIM.

PROC. ANN. art. 38.22, § 3(a)(2). Section 2 of article 38.22 requires that the accused receive the following warnings:

> (1)    he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2)    any statement he makes may be used as evidence against him in court;
>
> (3)    he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4)    if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5)    he has the right to terminate the interview at any time . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)(1)-(5). An accused must be administered these warnings "or their fully effective equivalent" in order for the statement to be admissible. *Id.* § 3(e)(2).

Article 38.22, section 3 is a procedural evidentiary rule rather than a substantive exclusionary rule. *Davidson v. State*, 25 S.W.3d 183, 186 (Tex. Crim. App. 2000). The erroneous admission of a statement in violation of the requirements of this section is therefore non-constitutional error, which we must disregard if it did not affect Hughes's substantial rights.[8] *See* TEX. R. APP. P. 44.2(b); *Nonn v. State*, 117 S.W.3d 874, 881 (Tex. Crim. App. 2003)*; Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g); *see also Andrews v. State*, No. 05-05-00960-CR, 2006 Tex. App. LEXIS 4566, at *9 (Tex. App.–Dallas May 26, 2006, no pet.) (mem. op., not designated for publication). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Nonn*, 117 S.W.3d at 881; *King v. State*, 953

---

[8] Hughes did not argue, in his motion to suppress or on appeal, that he was deprived of any constitutional right as a result of the allegedly defective warnings. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding that, in order to preserve procedural due process rights, an accused must be warned prior to questioning "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."). Instead, Hughes complains solely that the warnings failed to comply with the statutory requirements of article 38.22. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3 (Vernon 2005). Accordingly, to the extent Hughes raises an issue of constitutional error, he has not preserved that issue for our review. *See* TEX. R. APP. P. 33.1(a); *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) ("Even constitutional errors may be waived by failure to object at trial.").

S.W.2d 266, 271 (Tex. Crim. App. 1997). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

### 3. Analysis

Hughes complains that the warnings given by Detective Clemons failed to precisely track the requirements of article 38.22 in the following ways: (1) he was not warned that "any statement he makes may be used against him at his trial"; (2) he was warned that "anything you say," rather than "any statement [you] make[]," can be used against him in court; (3) he was not advised of his right to have an attorney physically present with him prior to any questioning; (4) he was advised that an attorney would be appointed to represent him if he could not "afford" one, but he was not advised that one would be appointed if he could not "employ" one; and (5) he was advised that he could "stop answering questions" but he was not advised of his right to "terminate the interview" at any time.

Hughes relies on the opinion of the Dallas Court of Appeals in *State v. Subke*, 918 S.W.2d 11, 14-15 (Tex. App.–Dallas 1995, pet. ref'd), where the court similarly considered whether a warning given prior to a custodial statement by the defendant was sufficient to satisfy article 38.22. In that case, the interviewing officer warned the defendant that "[y]ou have the right to remain silent and not make any statement at all and any statement you make will be used against you at your trial." *Id.* at 12. However, the officer did not warn the defendant that "any statement he makes may be used against him as evidence *in court*." *Id.* at 13 (emphasis added); *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)(2). The court noted that "a warning that conveys the exact meaning of the statute in slightly different language is sufficient to comply with the requirements of the statute." *Subke*, 918 S.W.2d at 14; *see Sosa v. State*, 769 S.W.2d 909, 915-16 (Tex. Crim. App. 1989). However, "[a] complete failure to give the statutory warnings precludes an oral statement

11

from being admissible against the accused." *Subke*, 918 S.W.2d at 14. In *Subke*, because the interviewing officer "completely failed to give the warning prescribed in subsection 2(a)(2)," the court found the warning to be insufficient and affirmed the trial court's suppression of the interview recording. *Id.* at 15.

On the other hand, in *Bible v. State*, the court of criminal appeals held that warnings were sufficient even though the interviewing officer only warned the defendant that his statement could be used against him "in court" and did not warn him that the statement could be used against him "at trial." 162 S.W.3d 234, 240-42 (Tex. Crim. App. 2005). There, the court of criminal appeals held that the word "court" is the fully effective equivalent of "trial" because the two required warnings "appear to largely overlap and, in fact, 'court' is the broader term, and is reasonably understood to include the term 'trial.'" *Id.* at 241.

In the instant case, Detective Clemons failed to give the "fully effective equivalent[s]" of the warnings required by section 2(a) of article 38.22. *See* TEX. CODE CRIM. PROC. ANN. art 38.22, § 2(a). First, Detective Clemons did not warn Hughes that "any statement" he makes may be used against him in court. *See id.* § 2(a)(2). Instead, she merely advised Hughes that "[a]nything you say can be used against you in court." This is not the "fully effective equivalent" of the required language because it did not explicitly warn Hughes that *non-verbal* statements, in addition to verbal statements, may be used against him. Second, Hughes was not advised of his "right to have a lawyer present to advise him *prior to* . . . any questioning." *See id.* § 2(a)(3) (emphasis added). He was merely advised of his right "to talk to a lawyer for advice" before questioning and to have him present "during any questioning." Third, although Hughes was told that he could "stop answering questions at any time," he was not advised of his right to completely terminate the interview in its entirety; that is, Hughes was not warned that he also had the right to stop the *questioning* at any time. *See id.* § 2(a)(5); *Woods v. State*, 152 S.W.3d 105, 115-18 (Tex. Crim. App. 2004). Considering these deficiencies, we do not believe that Detective Clemons's

12

warnings "convey[ed] the exact meaning of the statute in slightly different language." *See Subke*, 918 S.W.2d at 14; *Sosa*, 769 S.W.2d at 915-16. Instead, while the language used by Detective Clemons may have only been "slightly different" from the required language, the differences were of such a type and degree as to obscure the "exact meaning" of the warnings.[9]

Because Hughes was not given the warnings required by article 38.22 or their "fully effective equivalent[s]," the trial court erred by denying Hughes's motion to suppress and admitting the custodial statement into evidence. We must next determine whether Hughes's substantial rights were affected by this error. *See* TEX. R. APP. P. 44.2(b); *Davidson*, 25 S.W.3d at 186. In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)).

Other than the erroneously admitted custodial statement, the evidence at trial established that: (1) Lott had suffered "penetrating" and "sharp force" facial injuries; (2) those injuries could have been caused by a bloody steak knife found in Lott's apartment; (3) Hughes's fingerprint was found in blood on the knife; and (4) no other fingerprints were found on the knife. The jury also heard accomplice testimony from Walters that Hughes went to Lott's apartment; that he prevented her from leaving the apartment; that Lott then said "[h]elp" and "[p]lease stop" four times; that Hughes then returned to Harvey's apartment wearing a different pair of pants; and that he washed blood off his hands when he returned to Harvey's apartment. Given that the jury was presented with this persuasive

---

[9] Hughes additionally argues on appeal that the "cumulative effect" of the various deficiencies in Detective Clemons's warnings prevented those warnings from "substantially complying" with the statutory requirements. Because we have concluded that the "exact meaning" of the required warnings was not conveyed to Hughes, we need not reach the issue of whether a "cumulative effect" of several alleged errors can render warnings insufficient under article 38.22. *See* TEX. R. APP. P. 47.1.

13

evidence in addition to the custodial statement, we cannot say that the admission of the statement had "a substantial and injurious effect or influence in determining the jury's verdict." *See Nonn*, 117 S.W.3d at 881; *King*, 953 S.W.2d at 271. Accordingly, Hughes's substantial rights were not affected by the trial court's error in admitting the custodial statement into evidence. Hughes's first and second issues are therefore overruled.

## B. Corroboration of Accomplice Testimony

By his third issue, Hughes argues that the evidence presented at trial—other than his erroneously admitted custodial statement and the statement of Walters, an accomplice—was insufficient to support the judgment.

Article 38.14 of the code of criminal procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. § 38.14 (Vernon 2005). The evidence used for corroboration does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. *Patterson v. State*, 204 S.W.3d 852, 859 (Tex. App.–Corpus Christi 2006, pet. ref'd) (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992)). Nor must it directly link the accused to the commission of the offense. *Id.* (citing *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); *Gill*, 873 S.W.2d at 48; *Munoz*, 853 S.W.2d at 559; *Cox*, 830 S.W.2d at 611).

An accomplice is a person who participates with a defendant before, during, or after the commission of a crime and acts with the required culpable mental state. *Id.* at 858 (citing *Kutzner v. State*, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999)). A person is an accomplice as a matter of law if he or she would be susceptible to prosecution for the offense with which the accused is charged or a lesser included offense. *Id.* (citing *Kutzner*, 994 S.W.2d at 187). Assuming, without deciding, that Walters is properly considered an

14

"accomplice" under the applicable law, we conclude that the evidence adduced at trial other than her testimony is more than enough to "tend[] to connect the defendant with the offense committed." *See* Tex. Code Crim. Proc. Ann. § 38.14.

As noted, even excluding the erroneously admitted custodial statement and the testimony of Walters, the trial evidence established that Hughes's bloody fingerprint was found on a steak knife recovered from Lott's apartment, in close proximity to Lott's body. This evidence alone is sufficient to corroborate Walters's testimony. *See Cooks v. State*, 844 S.W.2d 697, 708 (Tex. Crim. App. 1992) (noting that the finding of appellant's fingerprints on a vehicle found near the scene of the crime "tend[ed] to connect" appellant with the subject offense); *Rios v. State*, 263 S.W.3d 1, 7 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd) (noting that appellant's fingerprints, found on the window of the victims' car on the night of the offense, tended to connect appellant to the charged offense); *cf. Hernandez v. State*, 578 S.W.2d 731, 732 (Tex. Crim. App. 1979) (finding insufficient corroborating evidence in part because "[n]o fingerprints or other identifying clues were found at the scene which would connect appellant with the offense"). Hughes's third issue is therefore overruled.

## C. Factual Sufficiency as to Cause of Death

By his fourth issue, Hughes argues that the evidence adduced at trial was factually insufficient to support a finding that Hughes caused the death of Lott.[10] We disagree.

In conducting a factual sufficiency review, we consider all the evidence in a neutral light and ask whether the jury was rationally justified in finding the element beyond a reasonable doubt. *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008) (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). The finding will be set aside only if: (1) it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, or (2) it is against the great weight and preponderance

---

[10] Hughes presents his fourth issue as follows: "The Evidence of 'Cause of Death' is Factually Insufficient to Support the Judgment." We interpret this as a challenge to the evidence supporting the causation element of the charged offense.

15

of the evidence. *Watson*, 204 S.W.3d at 415 (citing *Johnson v. State*, 23 S.W.3d 1, 10 (Tex. Crim. App. 2000)). Factual sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under such a charge, Hughes committed the offense of capital murder if he (1) intentionally caused Lott's death (2) while in the course of committing or attempting to commit the offense of robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2).

Hughes argues that "the evidence of cause-of-death is insufficient because the two medical examiners are diametrically opposed in their opinions." Hughes is correct that Drs. Peacock and Dolinak reached different conclusions after each performed an autopsy on Lott's body; Dr. Peacock concluded that Lott had died from a cocaine overdose, whereas Dr. Dolinak concluded that she died of "homicidal violence." However, although Dr. Peacock testified that she stood by her original conclusion, she did note that, if she had removed all the flesh from Lott's body and examined the extent of Lott's facial injuries, as Dr. Dolinak did, she "might very well have" reached the same conclusion as Dr. Dolinak as to Lott's cause of death. Even if Dr. Peacock did not acknowledge this, the jury is the exclusive judge of the facts and of the weight given to testimony. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) (citing TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979)). We must "afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Id.* "The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Id.* (citing *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006)). Here, where the jury was presented with conflicting expert testimony, we are in no position to say that the jury should have believed Dr. Peacock over Dr. Dolinak, when both opinions were based on probative evidence. *See Barry v. State*, 165 Tex. Crim. 204, 305 S.W.2d 580, 585-86 (1957) ("The jury was at liberty to believe any part of the [conflicting expert] testimony and reject the

16

remainder."); *Sanders v. State*, 771 S.W.2d 645, 649 (Tex. App.–El Paso 1989, pet. ref'd) (noting that the jury is the sole judge of weight and credibility to be given conflicting expert testimony); *see also Santiago v. State*, No. 04-08-00788-CR, 2009 Tex. App. LEXIS 9069, at *5-6 (Tex. App.–San Antonio Nov. 25, 2009, no pet.) (mem. op., not designated for publication).

Viewing all of the evidence in a neutral light, we cannot say that the jury's finding that Hughes caused Lott's death is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust; nor can we say that this finding is against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 415 (citing *Johnson*, 23 S.W.3d at 10). Accordingly, we conclude that the evidence was factually sufficient to support the judgment. Hughes's fourth issue is overruled.

### III. CONCLUSION

Having overruled Hughes's issues, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA
Justice

Do Not Publish.
Tex. R. App. P. 47.2(b)
Delivered and filed the
25th day of March, 2010.

17