NUMBER 13-09-00267-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


BRUCE HUGHES, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 24th District Court

of Victoria County, Texas.

 


MEMORANDUM OPINION


Before Justices Yañez, Rodriguez, and Garza


Memorandum Opinion by Justice Garza



 Appellant, Bruce Hughes, was convicted of capital murder and sentenced to life
imprisonment. See Tex. Penal Code Ann. § 19.03 (Vernon Supp. 2009). By four issues,
Hughes argues on appeal that: (1) he was administered insufficient warnings prior to
making a custodial statement to police, see Tex. Code Crim. Proc. Ann. art. 38.22, § 3
(Vernon 2005); (2) because of the insufficient warnings, the trial court erred in admitting
the statement into evidence; (3) without the statement, the testimony of an accomplice
witness was insufficient to support the judgment; and (4) the evidence as to the victim's
cause of death was factually insufficient to support the judgment. We affirm.


I. Background

 On March 27, 2008, Hughes was indicted by a Victoria County grand jury on one
count of capital murder and one count of murder. See Tex. Penal Code Ann. § 19.02
(Vernon 2003), § 19.03. (1) Hughes pleaded not guilty to each count.

 At trial, housekeepers Sarah Jeanis and Mary Alice Cano testified that, on March
8, 2006, they were asked to clean out apartment A2 of the Crossroads Apartments housing
complex in Victoria, Texas. Jeanis and Cano were told that the apartment was vacant;
however, when they opened the front door, they discovered the apartment was occupied. 
Jeanis called the apartment complex's office for assistance. Nellie Perez, an assistant
manager, then arrived and discovered the dead body of Melba Eileen Lott inside the
apartment. Officer Shane Wallace of the Victoria Police Department overheard the police
radio dispatch reporting the incident and went to the scene. When he entered the
apartment, Officer Wallace "immediately detected a strong odor. This odor is similar to a
decaying human body--[t]here's nothing similar to it. I've never smelled anything, while
working or my life experiences, that is anything in comparison to it." Officer Wallace also
stated that he "noticed some small spots of blood on the kitchen floor" where the body was
situated as well as in the hallway and bathroom of the apartment. According to Officer
Wallace, "[t]here was so much blood spatter [in the apartment] that it resembled a
Hollywood movie."

 Dozens of photographs taken by police investigators were presented to the jury. 
Several photographs depicted extensive blood spatter in the kitchen, hallway, bedroom and
bathroom of the apartment. Other photographs depicted empty beer cans and liquor
bottles scattered around the apartment. Another photograph, introduced as the State's
exhibit 64, depicted what appeared to be a steak knife found in the bedroom. The knife
had a long, thin blade which had been bent at approximately a right angle.

 Bryan Strong, a forensic scientist and certified fingerprint examiner for the Texas
Department of Public Safety, testified that he performed an analysis of fingerprints on two
beer cans found at the crime scene. Strong concluded that the prints matched the left
thumbprint of Hughes and the right index fingerprint of Stanford Harvey, Lott's upstairs
neighbor. (2) Strong also analyzed bloody fingerprints on a white paper instruction manual
recovered from Lott's apartment; those prints also matched Hughes's left thumbprint. 
Finally, Strong testified that he examined bloody fingerprints located on the handle of the
steak knife found in Lott's bedroom. The fingerprints on the knife matched Hughes's left
middle fingerprint; no other prints were found on the knife.

 Another Texas Department of Public Safety forensic scientist, Robin Olson Castro,
testified that she performed DNA analyses of blood samples taken from Lott's apartment. 
Castro found the DNA profile of a stain on a jacket found in Lott's bedroom to be
"consistent with the DNA profile of Bruce Hughes." When asked by the prosecutor whether
"a probability analysis" had been conducted, Castro replied in the affirmative and noted
that "[t]he probability of selecting an unrelated person at random who could be a source
of this DNA is approximately one in 515.5 quintillion for Caucasians, one in 101.6 quintillion
for Blacks, and one in 8.299 sextillion for Hispanics." According to Castro, DNA analysis
of other blood stains located in Lott's apartment--including stains from the hallway, kitchen
floor, and inside the pocket of a pair of pants found at the scene--produced the same
results, conclusively identifying the blood as Hughes's. Other blood samples taken from
Lott's apartment, including a sample taken from the blade of the steak knife recovered from
her bedroom, were consistent with the DNA profiles of both Lott and Hughes.

 Detective Jason Turner of the Victoria Police Department testified that he is trained
in blood spatter analysis and that he examined the various photographs of blood spatter
in Lott's apartment. After reviewing the photographs, Detective Turner stated that, in his
opinion, "the victim was, at one point, almost in a seated position, up against the wall,
before she slid, possibly, succumbing to a beating or injury." In one photograph, the blood
spatter appeared to form a "V" pattern; Detective Turner noted that this is a "telltale sign"
of "impact spatter" and agreed with the conclusion that this had been caused by
"something . . . striking the victim's head and face while the victim's head and face rested"
below where the spatter was located. The pattern was, according to Detective Turner,
"consistent with a beating while [the victim] is down on the ground."

 Amanda Jo Walters, an inmate in the Victoria County Jail who was also charged
with Lott's murder, testified on behalf of the State after being granted testimonial immunity
by the trial court. Walters testified that she had sold drugs to Harvey in the past and that
she had seen Hughes use cocaine on three previous occasions. On the last occasion, she
had used crack cocaine with Harvey and Hughes at Harvey's apartment. At one point
during that evening, according to Walters, Harvey stated "there was some money
downstairs and he wanted me to give him some coke, to take it down there." When asked
to clarify, Walters confirmed that Harvey had asked her to give him some crack cocaine
so that he could sell it to Lott, who lived downstairs from him. According to Walters,
Harvey also discussed robbing Lott or selling her the drugs and then stealing them back.

 Walters testified that she, Harvey, and Hughes proceeded downstairs to Lott's
apartment. At that point, Walters gave a small amount of crack cocaine to Harvey and
then went to Lott's bathroom where she consumed the remaining crack cocaine that she
had on her person. When she emerged from the bathroom, Walters observed Hughes
"grab" Lott as Lott was attempting to leave the apartment. Walters heard Harvey say that
"[i]f she [Lott] didn't give him the money, he'd kill her." Walters then exited the apartment
and went out to the parking lot of the apartment complex. In the parking lot, Walters could
hear "a sound, like fighting and stuff"; she also heard Lott saying "[h]elp" and "[p]lease
stop" a total of four times. She then observed Harvey and Hughes return to Harvey's
apartment, at which point, according to Walters, Hughes went to the kitchen to wash blood
off his hands. Walters also testified that Hughes had changed his pants while he was in
Lott's apartment. (3)

 David Dolinak, M.D., a forensic pathologist and chief medical examiner with the
Travis County Medical Examiner's Department, testified that two autopsies had been
carried out on Lott's body. The first autopsy, conducted by Elizabeth Peacock, M.D., was
performed prior to burial. The body was later exhumed and Dr. Dolinak performed a
second autopsy. Dr. Dolinak testified that he reviewed Dr. Peacock's report from the first
autopsy, and he summarized her conclusions as follows: 

Dr. Peacock concluded that Melba Lott had died as a result of cocaine
toxicity, or a type of drug death.


She, also, noted that there were blunt force injuries of the face that may have
been inflicted by another person or as a result of an accident or fall.


So, when she listed cause of death, she concluded that Melba Lott had died
of cocaine toxicity, but another significant factor in her report was blunt force
injuries of the face.


Dr. Dolinak also testified that a toxicology report, which was ordered by Dr. Peacock,
showed that Lott had cocaine, alcohol, and cocaethylene (4) present in her muscle tissue. 
According to Dr. Dolinak, although cocaine toxicity was listed as the cause of death in Dr.
Peacock's autopsy report, "[t]here's, really, no way for us to know for sure that cocaine is
what killed a person, if [the death is] not witnessed."

 Following his autopsy of Lott's body, Dr. Dolinak also prepared a report. Unlike Dr.
Peacock, however, Dr. Dolinak concluded that the cause of Lott's death was "homicidal
violence," with blood loss, ingestion of blood, and inhalation of blood all potentially
contributing to the death. Dr. Dolinak explained precisely why his conclusion differed from
that of Dr. Peacock:

In the ensuing time [following Dr. Peacock's autopsy], more investigation had
been done on the case, and I did an autopsy of Melba Lott. And what I had
found was--I had removed flesh from her face, the decomposed tissues, and
I saw some fractures--small fractures, around her nose and the bottom parts
of both eyes. I did a review of the original photographs from the first autopsy
and I was able to appreciate, even though the tissues were decomposed,
what looked like cuts around her . . . forehead, nose, and around her eyes. 
They may have been cuts or they may have been tears in the tissues. It was
hard to say for sure, just because the tissues were decomposed, but she
definitely had injuries about her face.


 . . . .


I had, also, reviewed photographs from the scene, from where Melba Lott
had been found dead, and had seen on those pictures quite a bit of blood
about the body. The blood was spattered--spattered on the walls and blood
was in a lot of different areas at the residence. It was a very bloody scene.


With that information, I, also, had additional police investigative information,
witness statements, that I had gone through, describing what appeared to be
a violent altercation before her death. And knowing that, through the
investigation, a bloody, bent knife had been found in her residence, with a
fingerprint on it that was not hers, I take all of that information together and
it's clear to me that she didn't just die of a cocaine overdose. She died a
violent death.


Dr. Dolinak further testified that the knife depicted in State's exhibit 64 would be capable
of making the "penetrating" and "sharp force" injuries that he had observed in his autopsy,
and that the amount of blood spatter visible in the apartment indicated that what had
occurred there was "a lot more than" just an accidental fall. He also stated that he
observed dark tissue, indicative of prior bruising, on Lott's left wrist, forearm, and shoulder,
which were consistent with defensive wounds.

 On cross-examination, Dr. Dolinak acknowledged that Dr. Peacock had previously
worked at the Travis County Medical Examiner's Office, and that he had never personally
witnessed the crime scene or personally handled the evidence upon which he based his
conclusion as to Lott's cause of death. Dr. Dolinak also agreed that people who use
cocaine can experience paranoid psychosis, auditory hallucinations, and a disassociation
with reality.

 Dr. Peacock testified that she has no "particular recollection" of her autopsy of Lott,
but she stated that she did not, as part of the autopsy, remove the skin and tissue from the
face. She said that she has "a vague memory" of having reviewed photographs from the
scene of Lott's death, but she could not recall whether she viewed the photographs before
or after the autopsy. Dr. Peacock also stated that she was not "made aware of any
statements made by people purported to be eyewitnesses" to Lott's death. She
acknowledged that, if she had been able to remove all the flesh from the body and
examine the extent of the injuries to Lott's facial bones, she "might very well have" reached
the same conclusion as Dr. Dolinak as to Lott's cause of death. However, she stated that
"I still don't believe that the fractures described [in Dr. Dolinak's report] are sufficient to
cause death."

 On March 17, 2008, Hughes was arrested and transported to the Victoria County
Jail, where he was interviewed by Victoria Police Department detectives Turner and
Amanda Clemons. (5) A video and audio recording of the interview was played to the jury
and a transcript of the interview with certain material redacted was entered into evidence. (6) 
The interview transcript reveals that, prior to questioning Hughes, Detective Clemons
administered the following warnings to him:

You have the right to remain silent. Anything you say can be used against
you in court.


You have the right to talk to a lawyer for advice before we ask you any
questions and have him during here--during--here during any questioning. 
If you cannot afford a lawyer, one will be appointed to you before any
questioning.


If you decide to answer questions now without a lawyer present, you will still
have the right to stop answering questions at any time. You also have the
right to stop answering questions at any time should you decide to talk to a
lawyer.


When Detective Clemons asked Hughes whether he understood those rights, Hughes
responded, "Yes, ma'am, uh-huh."

 Hughes stated in the interview that he and Lott were lovers and had used drugs for
two continuous days starting on or about Valentine's Day of 2006; that the two later got into
a physical altercation; that he struck Lott with his fists "maybe about 30 times"; that Lott
attempted to come after him with a knife; that he "grabbed the knife" and cut his finger; that
Lott threw a heater at him; that he left the apartment with Lott lying on the floor of her
bedroom; and that he changed his clothes before he left the apartment because he had
blood on his clothes. Hughes denied that Walters or Harvey were with him that night. The
interview continued:

Q. [Detective Turner] [I]n hindsight, Bruce, looking back, are you--are
you sorry for what you did?


A. [Hughes] Man, I'm sorry every day, man.


Q. I mean, is it safe to assume, just by what you're
telling me, is it safe to assume that [Lott] died
from wounds that she sustained from you? Did
she die from you beating her up so bad?


A. Pretty much.


Q. Did you mean--did you mean to kill her?


A. No, sir. . . . We had a fight. She fought me
harder than any man ever fought me.


 The jury found Hughes guilty of capital murder, and, because the State did not seek
the death penalty, Hughes was automatically sentenced to imprisonment for life without
parole. See id. § 12.31(a) (Vernon Supp. 2009). This appeal followed. (7)



II. Discussion

A. Sufficiency of Warnings

 By his first and second issues, Hughes argues that the warnings administered by
Detective Clemons prior to his custodial interview were insufficient under article 38.22 of
the Texas Code of Criminal Procedure, and that the trial court therefore erred in denying
his motion to suppress and admitting his ensuing statement. See Tex. Code Crim. Proc.
Ann. art. 38.22, § 3.

 1. Standard of Review

 Generally, we review a trial court's admission of evidence for an abuse of discretion. 
See Montgomery v. State, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). We afford almost
total deference to a trial court's determination of historical facts, especially when those
findings are based on an evaluation of credibility and demeanor. See Guzman v. State,
955 S.W.2d 85, 89 (Tex. Crim. App. 1997); State v. Oliver, 29 S.W.3d 190, 191 (Tex.
App.-San Antonio 2000, pet. ref'd). Similarly, we afford great deference to the trial court's
rulings on application of law to fact questions when resolution of those ultimate questions
turns on an evaluation of credibility and demeanor. See Guzman, 955 S.W.2d at 89.
However, we review de novo mixed questions of law and fact not falling within this
category. See id. Here, the facts surrounding Hughes's statement are not in dispute; the
only matter at issue is whether Detective Clemons's warnings satisfied article 38.22. 
Because this is a pure question of law, we will review the trial court's ruling de novo. See
Guzman, 955 S.W.2d at 89; Yarborough v. State, 178 S.W.3d 895, 901 (Tex.
App.-Texarkana 2005, pet. ref'd); Oliver, 29 S.W.3d at 191.

 2. Applicable Law

 Article 38.22, section 3 of the code of criminal procedure provides that an oral
custodial statement is inadmissible as evidence unless, among other things, the accused
is warned prior to the statement as provided in section 2 of that article and knowingly,
intelligently, and voluntarily waives the rights set out in the warning. Tex. Code Crim.
Proc. Ann. art. 38.22, § 3(a)(2). Section 2 of article 38.22 requires that the accused
receive the following warnings:

(1) he has the right to remain silent and not make any statement at all
and that any statement he makes may be used against him at his trial;


(2) any statement he makes may be used as evidence against him in
court;


(3) he has the right to have a lawyer present to advise him prior to and
during any questioning;


(4) if he is unable to employ a lawyer, he has the right to have a lawyer
appointed to advise him prior to and during any questioning; and


(5) he has the right to terminate the interview at any time . . . .


Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a)(1)-(5). An accused must be administered
these warnings "or their fully effective equivalent" in order for the statement to be
admissible. Id. § 3(e)(2).

 Article 38.22, section 3 is a procedural evidentiary rule rather than a substantive
exclusionary rule. Davidson v. State, 25 S.W.3d 183, 186 (Tex. Crim. App. 2000). The
erroneous admission of a statement in violation of the requirements of this section is
therefore non-constitutional error, which we must disregard if it did not affect Hughes's
substantial rights. (8) See Tex. R. App. P. 44.2(b); Nonn v. State, 117 S.W.3d 874, 881 (Tex.
Crim. App. 2003); Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on
reh'g); see also Andrews v. State, No. 05-05-00960-CR, 2006 Tex. App. LEXIS 4566, at
*9 (Tex. App.-Dallas May 26, 2006, no pet.) (mem. op., not designated for publication). 
A substantial right is affected when the error had a substantial and injurious effect or
influence in determining the jury's verdict. Nonn, 117 S.W.3d at 881; King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997). Conversely, an error does not affect a
substantial right if we have "fair assurance that the error did not influence the jury, or had
but a slight effect." Solomon v. State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001);
Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

 3. Analysis

 Hughes complains that the warnings given by Detective Clemons failed to precisely
track the requirements of article 38.22 in the following ways: (1) he was not warned that
"any statement he makes may be used against him at his trial"; (2) he was warned that
"anything you say," rather than "any statement [you] make[]," can be used against him in
court; (3) he was not advised of his right to have an attorney physically present with him
prior to any questioning; (4) he was advised that an attorney would be appointed to
represent him if he could not "afford" one, but he was not advised that one would be
appointed if he could not "employ" one; and (5) he was advised that he could "stop
answering questions" but he was not advised of his right to "terminate the interview" at any
time.

 Hughes relies on the opinion of the Dallas Court of Appeals in State v. Subke, 918
S.W.2d 11, 14-15 (Tex. App.-Dallas 1995, pet. ref'd), where the court similarly considered
whether a warning given prior to a custodial statement by the defendant was sufficient to
satisfy article 38.22. In that case, the interviewing officer warned the defendant that "[y]ou
have the right to remain silent and not make any statement at all and any statement you
make will be used against you at your trial." Id. at 12. However, the officer did not warn
the defendant that "any statement he makes may be used against him as evidence in
court." Id. at 13 (emphasis added); see Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a)(2). 
The court noted that "a warning that conveys the exact meaning of the statute in slightly
different language is sufficient to comply with the requirements of the statute." Subke, 918
S.W.2d at 14; see Sosa v. State, 769 S.W.2d 909, 915-16 (Tex. Crim. App. 1989). 
However, "[a] complete failure to give the statutory warnings precludes an oral statement
from being admissible against the accused." Subke, 918 S.W.2d at 14. In Subke,
because the interviewing officer "completely failed to give the warning prescribed in
subsection 2(a)(2)," the court found the warning to be insufficient and affirmed the trial
court's suppression of the interview recording. Id. at 15.

 On the other hand, in Bible v. State, the court of criminal appeals held that warnings
were sufficient even though the interviewing officer only warned the defendant that his
statement could be used against him "in court" and did not warn him that the statement
could be used against him "at trial." 162 S.W.3d 234, 240-42 (Tex. Crim. App. 2005). 
There, the court of criminal appeals held that the word "court" is the fully effective
equivalent of "trial" because the two required warnings "appear to largely overlap and, in
fact, 'court' is the broader term, and is reasonably understood to include the term 'trial.'" 
Id. at 241.

 In the instant case, Detective Clemons failed to give the "fully effective equivalent[s]"
of the warnings required by section 2(a) of article 38.22. See Tex. Code Crim. Proc. Ann.
art 38.22, § 2(a). First, Detective Clemons did not warn Hughes that "any statement" he
makes may be used against him in court. See id. § 2(a)(2). Instead, she merely advised
Hughes that "[a]nything you say can be used against you in court." This is not the "fully
effective equivalent" of the required language because it did not explicitly warn Hughes that
non-verbal statements, in addition to verbal statements, may be used against him. 
Second, Hughes was not advised of his "right to have a lawyer present to advise him prior
to . . . any questioning." See id. § 2(a)(3) (emphasis added). He was merely advised of
his right "to talk to a lawyer for advice" before questioning and to have him present "during
any questioning." Third, although Hughes was told that he could "stop answering questions
at any time," he was not advised of his right to completely terminate the interview in its
entirety; that is, Hughes was not warned that he also had the right to stop the questioning
at any time. See id. § 2(a)(5); Woods v. State, 152 S.W.3d 105, 115-18 (Tex. Crim. App.
2004). Considering these deficiencies, we do not believe that Detective Clemons's
warnings "convey[ed] the exact meaning of the statute in slightly different language." See
Subke, 918 S.W.2d at 14; Sosa, 769 S.W.2d at 915-16. Instead, while the language used
by Detective Clemons may have only been "slightly different" from the required language,
the differences were of such a type and degree as to obscure the "exact meaning" of the
warnings. (9)

 Because Hughes was not given the warnings required by article 38.22 or their "fully
effective equivalent[s]," the trial court erred by denying Hughes's motion to suppress and
admitting the custodial statement into evidence. We must next determine whether
Hughes's substantial rights were affected by this error. See Tex. R. App. P. 44.2(b);
Davidson, 25 S.W.3d at 186. In making this determination, we review the record as a
whole, including any testimony or physical evidence admitted for the jury's consideration,
the nature of the evidence supporting the verdict, and the character of the error and how
it might be considered in connection with other evidence in the case. Motilla v. State, 78
S.W.3d 352, 355 (Tex. Crim. App. 2002) (citing Morales v. State, 32 S.W.3d 862, 867 (Tex.
Crim. App. 2000)).

 Other than the erroneously admitted custodial statement, the evidence at trial
established that: (1) Lott had suffered "penetrating" and "sharp force" facial injuries; (2)
those injuries could have been caused by a bloody steak knife found in Lott's apartment;
(3) Hughes's fingerprint was found in blood on the knife; and (4) no other fingerprints were
found on the knife. The jury also heard accomplice testimony from Walters that Hughes
went to Lott's apartment; that he prevented her from leaving the apartment; that Lott then
said "[h]elp" and "[p]lease stop" four times; that Hughes then returned to Harvey's
apartment wearing a different pair of pants; and that he washed blood off his hands when
he returned to Harvey's apartment. Given that the jury was presented with this persuasive
evidence in addition to the custodial statement, we cannot say that the admission of the
statement had "a substantial and injurious effect or influence in determining the jury's
verdict." See Nonn, 117 S.W.3d at 881; King, 953 S.W.2d at 271. Accordingly, Hughes's
substantial rights were not affected by the trial court's error in admitting the custodial
statement into evidence. Hughes's first and second issues are therefore overruled.

B. Corroboration of Accomplice Testimony

 By his third issue, Hughes argues that the evidence presented at trial--other than
his erroneously admitted custodial statement and the statement of Walters, an
accomplice--was insufficient to support the judgment.

 Article 38.14 of the code of criminal procedure provides that "[a] conviction cannot
be had upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the corroboration is not
sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann.
§ 38.14 (Vernon 2005). The evidence used for corroboration does not need to be in itself
sufficient to establish guilt beyond a reasonable doubt. Patterson v. State, 204 S.W.3d
852, 859 (Tex. App.-Corpus Christi 2006, pet. ref'd) (citing Gill v. State, 873 S.W.2d 45,
48 (Tex. Crim. App. 1994); Munoz v. State, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993);
Cox v. State, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992)). Nor must it directly link the
accused to the commission of the offense. Id. (citing Dowthitt v. State, 931 S.W.2d 244,
249 (Tex. Crim. App. 1996); Gill, 873 S.W.2d at 48; Munoz, 853 S.W.2d at 559; Cox, 830
S.W.2d at 611).

 An accomplice is a person who participates with a defendant before, during, or after
the commission of a crime and acts with the required culpable mental state. Id. at 858
(citing Kutzner v. State, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999)). A person is an
accomplice as a matter of law if he or she would be susceptible to prosecution for the
offense with which the accused is charged or a lesser included offense. Id. (citing Kutzner,
994 S.W.2d at 187). Assuming, without deciding, that Walters is properly considered an
"accomplice" under the applicable law, we conclude that the evidence adduced at trial
other than her testimony is more than enough to "tend[] to connect the defendant with the
offense committed." See Tex. Code Crim. Proc. Ann. § 38.14. 

 As noted, even excluding the erroneously admitted custodial statement and the
testimony of Walters, the trial evidence established that Hughes's bloody fingerprint was
found on a steak knife recovered from Lott's apartment, in close proximity to Lott's body. 
This evidence alone is sufficient to corroborate Walters's testimony. See Cooks v. State,
844 S.W.2d 697, 708 (Tex. Crim. App. 1992) (noting that the finding of appellant's
fingerprints on a vehicle found near the scene of the crime "tend[ed] to connect" appellant
with the subject offense); Rios v. State, 263 S.W.3d 1, 7 (Tex. App.-Houston [1st Dist.]
2005, pet. ref'd) (noting that appellant's fingerprints, found on the window of the victims'
car on the night of the offense, tended to connect appellant to the charged offense); cf.
Hernandez v. State, 578 S.W.2d 731, 732 (Tex. Crim. App. 1979) (finding insufficient
corroborating evidence in part because "[n]o fingerprints or other identifying clues were
found at the scene which would connect appellant with the offense"). Hughes's third issue
is therefore overruled.

C. Factual Sufficiency as to Cause of Death

 By his fourth issue, Hughes argues that the evidence adduced at trial was factually
insufficient to support a finding that Hughes caused the death of Lott. (10) We disagree.

 In conducting a factual sufficiency review, we consider all the evidence in a neutral
light and ask whether the jury was rationally justified in finding the element beyond a
reasonable doubt. Grotti v. State, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008) (citing
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). The finding will be set
aside only if: (1) it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and manifestly unjust, or (2) it is against the great weight and preponderance
of the evidence. Watson, 204 S.W.3d at 415 (citing Johnson v. State, 23 S.W.3d 1, 10
(Tex. Crim. App. 2000)). Factual sufficiency is measured by the elements of the offense
as defined by a hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002,
pet. ref'd). Under such a charge, Hughes committed the offense of capital murder if he (1)
intentionally caused Lott's death (2) while in the course of committing or attempting to
commit the offense of robbery. See Tex. Penal Code Ann. § 19.03(a)(2).

 Hughes argues that "the evidence of cause-of-death is insufficient because the two
medical examiners are diametrically opposed in their opinions." Hughes is correct that Drs.
Peacock and Dolinak reached different conclusions after each performed an autopsy on
Lott's body; Dr. Peacock concluded that Lott had died from a cocaine overdose, whereas
Dr. Dolinak concluded that she died of "homicidal violence." However, although Dr.
Peacock testified that she stood by her original conclusion, she did note that, if she had
removed all the flesh from Lott's body and examined the extent of Lott's facial injuries, as
Dr. Dolinak did, she "might very well have" reached the same conclusion as Dr. Dolinak as
to Lott's cause of death. Even if Dr. Peacock did not acknowledge this, the jury is the
exclusive judge of the facts and of the weight given to testimony. Lancon v. State, 253
S.W.3d 699, 705 (Tex. Crim. App. 2008) (citing Tex. Code Crim. Proc. Ann. art. 36.13
(Vernon 2007), art. 38.04 (Vernon 1979)). We must "afford almost complete deference to
a jury's decision when that decision is based upon an evaluation of credibility." Id. "The
jury is in the best position to judge the credibility of a witness because it is present to hear
the testimony, as opposed to an appellate court who relies on the cold record." Id. (citing
Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006)). Here, where the jury was
presented with conflicting expert testimony, we are in no position to say that the jury should
have believed Dr. Peacock over Dr. Dolinak, when both opinions were based on probative
evidence. See Barry v. State, 165 Tex. Crim. 204, 305 S.W.2d 580, 585-86 (1957) ("The
jury was at liberty to believe any part of the [conflicting expert] testimony and reject the
remainder."); Sanders v. State, 771 S.W.2d 645, 649 (Tex. App.-El Paso 1989, pet. ref'd)
(noting that the jury is the sole judge of weight and credibility to be given conflicting expert
testimony); see also Santiago v. State, No. 04-08-00788-CR, 2009 Tex. App. LEXIS 9069,
at *5-6 (Tex. App.-San Antonio Nov. 25, 2009, no pet.) (mem. op., not designated for
publication).

 Viewing all of the evidence in a neutral light, we cannot say that the jury's finding
that Hughes caused Lott's death is so contrary to the overwhelming weight of the evidence
as to be clearly wrong and manifestly unjust; nor can we say that this finding is against the
great weight and preponderance of the evidence. See Watson, 204 S.W.3d at 415 (citing
Johnson, 23 S.W.3d at 10). Accordingly, we conclude that the evidence was factually
sufficient to support the judgment. Hughes's fourth issue is overruled.

III. Conclusion

 Having overruled Hughes's issues, we affirm the judgment of the trial court.




 ________________________

 DORI CONTRERAS GARZA

 Justice


Do Not Publish.

Tex. R. App. P. 47.2(b)

Delivered and filed the

25th day of March, 2010.
1. The first count alleged that Hughes intentionally caused the death of Melba Eileen Lott while in the
course of committing or attempting to commit the offense of robbery. See Tex. Penal Code Ann. § 19.03
(Vernon Supp. 2009). The first two paragraphs of the second count alleged that Hughes intended to cause
serious bodily injury and committed an act clearly dangerous to human life that caused Lott's death. See id.
§ 19.02(b)(2) (Vernon 2003). The second two paragraphs of the second count alleged that Hughes
intentionally, knowingly, or recklessly committed or attempted to commit aggravated assault, and in the course
of and in furtherance of that commission or attempt, committed an act clearly dangerous to human life that
caused Lott's death. See id. § 19.02(b)(3).
2. Harvey was also charged with Lott's murder and was tried separately.
3. When asked how she knew that Hughes had changed his pants, Walters stated: "Because the ones
he had on were like--[k]ind of lighter than the pants that he had when he went in there, where--unless I was
just high, it looked like he had changed pants."
4. Dr. Dolinek testified that cocaethylene is a compound that is part alcohol and part cocaine, and is
formed in the body after a person consumes both substances.
5. At the time of the investigation, Detective Clemons was known as Amanda Moeller, and the latter
name is used exclusively by Hughes in his appellate brief.
6. Prior to trial, defense counsel filed a motion to suppress Hughes's custodial statement. After a
hearing, the trial court denied the motion. At trial, the statement was admitted into evidence over the objection
of defense counsel.
7. The State has not filed a brief to assist us in the resolution of this matter.
8. Hughes did not argue, in his motion to suppress or on appeal, that he was deprived of any
constitutional right as a result of the allegedly defective warnings. See Miranda v. Arizona, 384 U.S. 436, 444
(1966) (holding that, in order to preserve procedural due process rights, an accused must be warned prior to
questioning "that he has a right to remain silent, that any statement he does make may be used as evidence
against him, and that he has a right to the presence of an attorney, either retained or appointed."). Instead,
Hughes complains solely that the warnings failed to comply with the statutory requirements of article 38.22. 
See Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (Vernon 2005). Accordingly, to the extent Hughes raises an
issue of constitutional error, he has not preserved that issue for our review. See Tex. R. App. P. 33.1(a);
Briggs v. State, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) ("Even constitutional errors may be waived by
failure to object at trial.").
9. Hughes additionally argues on appeal that the "cumulative effect" of the various deficiencies in
Detective Clemons's warnings prevented those warnings from "substantially complying" with the statutory
requirements. Because we have concluded that the "exact meaning" of the required warnings was not
conveyed to Hughes, we need not reach the issue of whether a "cumulative effect" of several alleged errors
can render warnings insufficient under article 38.22. See Tex. R. App. P. 47.1.
10. Hughes presents his fourth issue as follows: "The Evidence of 'Cause of Death' is Factually
Insufficient to Support the Judgment." We interpret this as a challenge to the evidence supporting the
causation element of the charged offense.